Conway B, J. In November, 1842, Smith instituted an action of replevin against the Joneses for the recovery of a male slave. The defendants pled that they did not detain the slave as alleged, and that the action did not accrue within two years. The plaintiff joined issue, a jury came, and on trial gave a verdict for the defendants. The plaintiff moved for a new trial, which being refused, he excepted, spread out the evidence, and brought error. The defendants claim to have derived title to the slave from plaintiff’s son John, and the principal question is, whether the transaction in Alabama between plaintiff and his son was a loan or a gift of the slave. The proof was “that in the spring of 1840, when plaintiff’s son, John, was about starting from his father’s in Alabama to Arkansas, plaintiff told him, he would let him have one of three negro boys, that he might take choice, and John selected the boy in controversy, and that plaintiff then remarked to him that he would let him have the boy he selected as a loan to be re-delivered when called for, and John assented to this and left with the boy. That plaintiff had loaned slaves to several of his children in the same way. ” This was all the evidence relative to the arrangement about the slave., between the plaintiff and his son, and does not, it seems to us, sustain the position in behalf of defendants, that the plaintiff first gave the slave to his son, and subsequently characterized the transaction as a loan, for the purpose of covering and concealing the gift; on the contrary, it is clear to our minds, that the whole transaction between them respecting the slave took place at tire same time, was intended by plaintiff as a loan in good faith, and so agreed and understood by both parties. The fact of the loan’s having been made by the father to his son, when about leaving Alabama for Arkansas, does not at all change the legal character of the transaction. For a man, free from embarrassment (as plaintiff was), has the undoubted right to dispose of his property on such terms as he thinks fit, as well to his offspring as to other persons; and from a father’s peculiar relation to his children, he is presumed to know more of their dispositions and to understand better what would be suitable provisions for them tiran strangers do $ and if it is his duty to educate them and provide for them, it certainly is his privilege to do so, in such manner as comports best with bis own good taste and sound judgment. 'When, therefore, he chooses to loan slaves to them, instead of giving them, such course surely affords no just ground for suspecting him of fraudulent intentions, especially when it is shown to be bis usual mode of providing for his children. The after declarations and conduct of the son and his friends, in reference to the interest the son had in the slave, did not in the least affect plaintiff’s title, or change the character of the transaction between him and his son. Nor did the sale of the slave by the son pass to the purchaser any title, for the son was a mere bailee, without authority to sell; and could at most only transfer the interest in the slave which he himself possessed. Jones on Bailments, 64. Long on Personal Property, 26 and 102. Chitty on Contracts, 110. It being established, then, that the plaintiff did not give the slave to his son, but made a discretionary bailment of him, it follows that the son, as bailee, or those holding under him, had the right to the possession of the slave, according to the terms of the bailment, until called for. Of course, therefore, no right of action accrued before demand made. The witness, Heard, states, that sometime after plaintiff’s son John came to Arkansas, he sold the slave, and that witness wrote to witness informing him of die slave’s having been sold, and advised him to come on and attend to it, or he would lose his negro. That plaintiff afterward sent a power of attorney to witness empowering and instructing him to do whatever was necessary to recover the negro. He then went to defendants, (which was in the summer of 1S41), saw the slave in their possession, and demanded him; but they refused to surrender him. This suit was instittuted in the fall 1843, at most only sixteen or eighteen months after plaintiff thought proper to determine the bailment. So, even two years had not elapsed after right of action accrued, before suit was actually commenced. It appears therefore that there was no evidence to justify the verdict of the jury on either issue; consequently the court erred in refusing the plaintiff a new trial. We have not thought it necessary to discuss plaintiff’s exceptions respecting the instructions, for the reason that, from the view we have taken of the law governing the case, they present questions wholly unimportant to the controversy. The judgment reversed.